UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KENNETH W. WILKINSON,<br>Plaintiff, | :<br>:<br>: | |
| v. | : | CA 07-090 M |
| MICHAEL J. ASTRUE,<br>COMMISSIONER,<br>SOCIAL SECURITY ADMINISTRATION,<br>Defendant. | :<br>:<br>:<br>:<br>: | |

**MEMORANDUM AND ORDER**

This is an action for judicial review pursuant to 42 U.S.C. § 1383(c)(3) of the decision of the Commissioner of Social Security ("the Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), under § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) ("the Act"). Plaintiff Kenneth Wilkinson ("Plaintiff") has filed a motion to reverse the decision of the Commissioner. Defendant Michael J. Astrue ("Defendant") has filed a motion for an order affirming the decision of the Commissioner. With the parties' consent, this case has been referred to a magistrate judge for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. For the reasons set forth herein, I find that the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record. Accordingly, based on the following analysis, I order that Defendant's Motion for Order Affirming the Decision of the Commissioner (Document ("Doc.") #8) ("Motion to Affirm") be granted and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. #7) ("Motion to Reverse") be denied.

## Facts and Travel

On March 31, 2004, Plaintiff filed applications for DIB and SSI, alleging disability since January 15, 1999, because of HIV infection, peripheral neuropathy, depression, and borderline-to-low-average IQ. (Record ("R.") at 12, 14, 77-80) His applications were denied initially, (R. at 67), and upon reconsideration, (R. at 66). Plaintiff requested an administrative hearing. (R. at 68) On April 4, 2006, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (R. at 30-65) The ALJ issued a decision on May 10, 2006, finding that Plaintiff was not disabled. (R. at 12-22) The Appeals Council denied Plaintiff's request for review on July 20, 2006, (R. at 4-6), thereby rendering the ALJ's decision the final decision of the Commissioner, (R. at 4). Plaintiff thereafter filed this action for judicial review.

## Issue

The issue for determination is whether there is substantial evidence in the record to support the decision of the Commissioner that Plaintiff is not disabled within the meaning of the Act.

## Standard of Review

The Court's role in reviewing the Commissioner's decision is limited. Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999). Although questions of law are reviewed *de novo*, the Commissioner's findings of fact, if supported by substantial evidence in the record,[1] are conclusive. Id. (citing 42 U.S.C. §

---

[1] The Supreme Court has defined substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217

405(g)). The determination of substantiality is based upon an evaluation of the record as a whole. Id. (citing Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1999)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)). The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420, 1426 (1971))).

**Law**

To qualify for DIB, a claimant must meet certain insured status requirements,[2] be younger than 65 years of age, file an application for benefits, and be under a disability as defined by the Act. See 42 U.S.C. § 423(a). An individual is eligible to receive SSI if he is aged, blind, or disabled and meets certain income requirements. See 42 U.S.C. § 1382(a).

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. 423(d)(1)(A). A claimant's impairment must be of such

(1938)); see also Suranie v. Sullivan, 787 F.Supp. 287, 289 (D.R.I. 1992).

[2] The ALJ stated that Plaintiff met the nondisability requirements and was insured for benefits through June 30, 2002. (R. at 12, 14)

severity that he is unable to perform his previous work or any other kind of substantial gainful employment which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[3] 20 C.F.R. §§ 404.1521(a), 416.921(a) (2007).[4] A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1528 (2007)("Your statements alone are not enough to establish that there is a physical or mental impairment.").

The Social Security regulations prescribe a five-step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 2291 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work

---

[3] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b) (2007). Examples of these include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

Id.

[4] The Social Security Administration ("SSA") has promulgated identical sets of regulations governing eligibility for DIB and SSI. See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986). For simplicity, the Court hereafter will cite only to one set of regulations. See id.

activity; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Commissioner's listed impairments; (4) whether he is able to perform his past relevant work; and (5) whether he remains capable of performing any work within the economy. See 20 C.F.R. § 404.1520(b)-(g). The evaluation may be terminated at any step. See Seavey v. Barnhart, 276 F.3d at 5. "The applicant has the burden of production and proof at the first four steps of the process. If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).

**ALJ's Decision**

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability on January 15, 1999, (R. at 12, 14); that Plaintiff's HIV infection, peripheral neuropathy, depression, and borderline-to-low-average IQ were severe but did not meet or equal any listed impairment, (R. at 14, 15); that, physically, Plaintiff had the residual functional capacity ("RFC") to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday, but was unable to use his lower extremities repetitively for operation of leg controls and was restricted from climbing ropes, ladders, or scaffolds, (R. at 16); that, mentally, Plaintiff had a moderate limitation in his ability to understand and remember detailed instructions, a moderate limitation in his ability to respond appropriately to changes in the work setting, and moderate difficulties in maintaining concentration, persistence or pace, enabling him to

perform simple, routine, competitive, repetitive tasks on a sustained basis during a normal eight-hour workday in a stable work environment, with no more than simple decision-making, with no requirement to perform detailed, complex tasks, and with light supervision (i.e., without excessive pressure regarding production), (R. at 16); that Plaintiff was unable to perform any past relevant work, (R. at 20); that, considering Plaintiff's age, education, work experience, and RFC, jobs existed in substantial numbers in the national economy which Plaintiff was capable of performing, (id.); and that, therefore, Plaintiff was not disabled within the meaning of the Act at any time from January 15, 1999, through the date of the ALJ's decision, (R. at 21).

## Error Claimed

Plaintiff alleges that the ALJ's finding that Plaintiff did not meet Listing 12.05B[5] is not supported by substantial evidence. See Plaintiff's Memorandum in Support of His Motion to Reverse the Decision of the Commissioner ("Plaintiff's Mem.") at 9.

## Discussion

The ALJ found that Plaintiff did meet the criteria of Listing 12.05B for two reasons. (R. at 16) First, the low I.Q.

---

[5] Listing 12.05, mental retardation, provides in relevant part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ....
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> ....

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

scores[6] obtained by James Curran, Ph.D. ("Dr. Curran"), were, in the opinion of two state agency psychological consultants, inconsistent with Plaintiff's general presentation, especially his verbal ability, as reflected in the record and in the questionnaires which he completed. (R. at 16, 276, 313) In addition, a consulting examiner opined that Plaintiff had borderline-to-low-average intellectual functioning. (R. at 16, 293) Second, the ALJ noted that Plaintiff "lacks the deficits in adaptive functioning that characterize mental retardation." (R. at 16)

It is the ALJ's responsibility to resolve conflicts in the evidence, not the Court's. See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)("[T]he resolution of conflicts in the evidence is for the [Commissioner], not the courts."); Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987)("Conflicts in the evidence are, assuredly, for the [Commissioner]--rather than the courts--to resolve."). Moreover, "[i]t is within the [Commissioner's] domain to give greater weight to the testimony and reports of medical experts who are commissioned by the [Commissioner]."[7] Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 n.1 (1st Cir. 1988). Thus, it was permissible for the ALJ to give more weight to the opinions of the reviewing state agency psychologists and the consultative examiner than to Dr. Curran's evaluation.

The ALJ has the duty to undertake a proper mode of analysis to resolve conflicts of record as to an IQ score. See Plourde v.

[6] In testing of Plaintiff conducted on June 16, 2004, Dr. Curran obtained the following scores: Verbal IQ = 59, Performance IQ = 57, and Full Scale IQ = 54. (R. at 261)

[7] The Court recognizes that Dr. Curran was chosen by the state agency. (R. at 258) However, it was still the ALJ's responsibility to resolve conflicts in the evidence.

Barnhart, No. 02-164-B-W, 2003 WL 22466176, at *3 (D. Me. Oct. 31, 2003)(finding that the ALJ "abdicated his responsibility to choose between conflicting IQ test results or, at a minimum, at least assess the validity of the ... results [which met Listing 12.05C requirement]"). The Commissioner is "not obliged to accept the results of claimant's IQ tests if there is a substantial basis for believing that claimant was feigning the results." Soto v. Sec'y of Health & Human Servs., 795 F.2d 219, 222 (1st Cir. 1986). The Commissioner may also reject IQ scores that are inconsistent with the record. Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998); Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)(holding that it was "proper for the ALJ to examine the other evidence in the record in determining whether [claimant] was in fact mentally retarded."); id. ("The plaintiff has failed to supply this court, nor have we found any case law requiring the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test in its determination of mental retardation.")(quoting Strunk v. Heckler, 732 F.2d 1357, 1360 (7th Cir. 1984)).

The ALJ found that the results of the IQ testing by Dr. Curran were invalid, (R. at 19), for the following reasons:

> The claimant completed the tenth grade while attending regular (i.e., not special education) classes. He never repeated a grade. His treating doctors offer no comments regarding poor cognitive functioning. In light of the claimant's history of substance abuse, his poor performance on the day of the evaluation may have been influenced by the use of substances. The undersigned finds that Dr. Schwartz's assessment of the claimant's level of intellectual functioning – i.e., the borderline-to-low-average range – is most consistent with the medical evidence.

(R. at 19)

Plaintiff argues that the ALJ's reasoning was erroneous and contrary to First Circuit precedent. See Plaintiff's Mem. at 10.

In particular, he cites Nieves v. Secretary of Health & Human Servs., 775 F.2d 12 (1st Cir. 1985). In that case, the First Circuit held that the Secretary was not at liberty to substitute her own opinions of an individual's health for uncontroverted medical evidence. Id. at 14. The evidence in question was the claimant's IQ scores. Id. The Secretary rejected their validity because of a belief that, if they were accurate, the claimant would not have been able to perform her prior work as a seamstress. Id. In reversing the Secretary's determination, the First Circuit stressed that the IQ evidence "was the *only* medical evidence before the ALJ on this point." Id.

Here the evidence regarding Plaintiff's IQ was not uncontroverted. The ALJ relied on the opinions of three psychologists who indicated that the IQ scores were inconsistent with other evidence in the record or at variance with their own assessments of Plaintiff's capabilities. On July 9, 2004, state agency psychological consultant Judith Capps, Ph.D. ("Dr. Capps"), reviewed Dr. Curran's evaluation. (R. at 264) Dr. Capps noted that Plaintiff had scored in the defective range but found that this was "inconsistent with his general presentation, especially his verbal ability," (R. at 276), as evidenced by his "ability to comprehend and respond to questions on forms," (id.). Dr. Capps additionally pointed out that there was no mention of impaired cognition in Plaintiff's medical records, that Plaintiff was seeing a counselor for the first time, and that there was no evidence of any mental disorder prior to Plaintiff's last insured date. (Id.)

Psychologist Wendy Schwartz, Ph.D. ("Dr. Schwartz"), conducted a consultative examination of Plaintiff on December 3, 2004. (R. at 290) In her report, Dr. Schwartz wrote that Plaintiff's IQ scores were "somewhat surprising ... I would have thought that the patient would have functioned higher, in the borderline range." (R. at 294) She noted that when she

administered the Mini-Mental Status Exam ("MMSE")[8] to Plaintiff he obtained an average score, but on the MMSE administered by Dr. Curran Plaintiff had obtained a raw score of only 20. (Id.) Dr. Schwartz additionally noted that Dr. Curran gave Plaintiff low reading, arithmetic, and spelling scores, which she felt were "somewhat lower than I would have thought." (Id.) Based on her mental status exam, Dr. Schwartz assessed Plaintiff as functioning in a borderline-to-low-average range. (R. at 293)

Another reviewing medical consultant, M.E. Menken, Ph.D. ("Dr. Menken"), reviewed Plaintiff's medical records on December 22, 2004. (R. at 313) Dr. Menken recorded that Plaintiff's low IQ scores are "neither consistent with [Plaintiff's] functional history, nor with his presentation during eval[uation]." (Id.) Dr. Menken additionally noted that the consultative examination conducted by Dr. Schwartz indicated that Plaintiff's intellectual functioning was in the borderline-to-low-average range. (Id.)

Plaintiff argues that the ALJ discredited the results of Dr. Curran's IQ tests without substantial evidence. Plaintiff asserts that the only evidence that the scores may have been inaccurate were the "speculations of the non-examining psychologists and Dr. Schwartz." Plaintiff's Mem. at 11. The Court disagrees, as these medical experts gave reasons, which are supported by the record, for their opinions.

Although Plaintiff contends that there is no indication that

[8] The Mini-Mental Status Exam ("MMSE") "consists of eleven questions that are used to assess such *cognitive* functions as orientation, learning and memory, attention, calculations, comprehension, reading, writing, and drawing." Kellogg v. Astrue, No. CV 07-083-TUC-RCC, 2008 WL 906594, at *20 (D. Ariz. Mar. 31, 2008)(quoting Richard F. Spiegle, Spencer J. Crona, Legal Guidelines and Methods for Evaluating Capacity, in Colorado Lawyer, 32 Jun. Colo. Law. 65, 68 (June 2003) (emphasis added)). "A normal score is 30 and most people score between 26-30." Hometown Folks, LLC v. S&B Wilson, Inc., No. 1:06-cv-81, 2007 WL 2227817, at *5 (E.D. Tenn. July 31, 2007). A score of 20 "is quite low." Id.

Plaintiff completed the forms in connection with his Social Security application, see id., Plaintiff identified himself as completing them. (R. at 97, 100) In addition, Plaintiff has a distinctive way of printing the lower case letter "e." (Id.) It resembles a reversed numeral 3. (Id.) Similar lower case "e"s appear in the handwritten response appearing on at least several of the forms.[9] (R. at 90-97, 98-100, 111-16, 117-24) The Court is satisfied that there is substantial evidence to support the finding that Plaintiff completed these forms.

Plaintiff argues that even if he did fill out the forms, this is not substantial evidence that his IQ was not of listing level. See Plaintiff's Reply Brief ("Plaintiff's Reply") at 2. The Court disagrees. It was the expert opinion of Drs. Capps and Menken that Plaintiff's ability to comprehend and respond to the questions on the forms was inconsistent with the test results obtained by Dr. Curran. (R. at 276, 313) The Court has examined these forms and finds no basis to reject the doctors' opinions. The record, thus, supports the opinion of Drs. Capps and Menken that Plaintiff's general presentation, including his verbal ability, was not consistent with intellectual functioning in the defective range.

Plaintiff asserts that there is no indication that his presentation was inconsistent with his IQ scores and notes that Dr. Curran did not find this to be the case. See Plaintiff's Mem. at 11. However, a fair reading of Dr. Schwartz's report indicates that she found Plaintiff's presentation to be inconsistent with those scores. This is evidenced by her repeated statements that she would have expected Plaintiff's scores to be higher based on the results of her examination. (R. at 294) Dr. Schwartz based her opinion that Plaintiff was

---

[9] It is true that the handwriting on some forms, (see, e.g., R. at 8, 72), does not appear to be Plaintiff's.

functioning in a borderline-to-low-average range mentally on her clinical examination and the results of the MMSE which she administered. (R. at 290) By no means can this evidence be characterized as "speculation[]," Plaintiff's Mem. at 11, as Plaintiff asserts.[10]

Plaintiff argues that it is not clear whether Plaintiff was in special education. See id. at 12. However, the evidence on this point was consistent. Plaintiff told Dr. Curran that he was in regular education and not special education. (R. at 258) Plaintiff told Dr. Schwartz that he had never stayed back a grade or been in special education. (R. at 291) At the hearing, Plaintiff testified that he was not in special education but in "lower" classes. (R. at 58-59) Plaintiff also testified that he completed the tenth grade, that he never repeated a grade, and that he was able to read and write. (R. at 36, 58, 60) Thus, the ALJ's statements that Plaintiff attended regular and not special education and that he never repeated a grade are fully supported by the record.[11]

Plaintiff contends that the lack of comment by Plaintiff's treating doctors regarding his cognitive functioning was not probative of his IQ. See Plaintiff's Mem. at 12. The Court disagrees. Plaintiff had an extensive medical history due largely to his HIV positive condition. Although there are numerous entries that Plaintiff was non-compliant with his treatment regimen, (see e.g., R. at 158, 161, 177, 182, 183, 186,

---

[10] Dr. Schwartz also noted discrepancies between what Plaintiff reported to Dr. Curran and what he told her. (R. at 294)

[11] Although Plaintiff states that the ALJ did not make an issue of a low IQ prior to age 22, see Plaintiff's Mem. at 13 n.4, the fact that Plaintiff was never in special education, a point which the ALJ made, (R. at 19), has at least some relevance to the issue of whether Plaintiff had "deficits in adaptive functioning initially manifested during the developmental period ...," 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

198, 199, 215, 218, 227, 326, 348, 405), none of these entries suggests that the reason for his non-compliance was intellectual deficiency. Rather, it appears that the reason was Plaintiff's longstanding problems with substance abuse, (R. at 349, 350, 351), and his repeated periods of incarceration, (R. at 362-492). Perhaps even more probative, Plaintiff's therapist, whose interaction with Plaintiff would seemingly have detected such deficiency, failed to note any significant difficulties. (R. at 283-85) Thus, the ALJ's point regarding the absence of comments by Plaintiff's medical providers is valid. See Dumas v. Schweiker, 712 F.2d 1545, 1553 (2nd Cir. 1983)("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say.").

Plaintiff argues that the ALJ had no basis to conclude that Plaintiff's substance abuse affected his IQ scores. See Plaintiff's Mem. at 12. However, Plaintiff had a long history of substance abuse. (R. at 276) He told Dr. Curran that he had used crack cocaine for ten years and that he "used to have blackouts when he was younger and drank a lot," (R. at 262), but that he had stopped using drugs and drinking in October of 2003, (R. at 259). Dr. Curran conducted his evaluation of Plaintiff on June 16, 2004, (R. at 258), and just over six weeks later, on August 5, 2004, Plaintiff's urine tested positive for cocaine and opiates. (R. at 336) On August 11, 2004, Plaintiff was seen at Thundermist Health Associates, and the treatment note states in part: "Denies drug use, tho[ugh] urine tox screen was positive for cocaine & heroin." (R. at 338) At the hearing Plaintiff testified that he was drinking in March of 2005 but denied using illegal drugs, although there was evidence to the contrary in the record.[12] (R. at 41) While collectively this evidence does not

[12] A March 7, 2005, report from Thundermist Health Center indicates that Plaintiff "has significant substance use problem both alcohol and cocaine. Took meds for only 1 week and stop[ped] because of

establish that Plaintiff was using drugs and/or alcohol at the time of Dr. Curran's testing, it provides at least some basis for the ALJ's statement regarding drug use. (R. at 19)

Plaintiff argues that the ALJ should have ordered another IQ test. The ALJ does not have to order a retest when Plaintiff's counsel did not request one. See Hopkins v. Astrue, No. 07-40-P-S, 2007 WL 3023493, at *4 (D. Me. Oct. 12, 2007)(ALJ did not "abuse his discretion in failing to order a second consultative examination for purposes of retesting the plaintiff's IQ" because the plaintiff's counsel "did not request such a retest"); see also Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991)("In most instances, where appellant himself fails to establish a sufficient claim of disability, the [Commissioner] need proceed no further.").

Lastly, although Plaintiff challenges the ALJ's finding that Plaintiff lacked deficits in adaptive functioning, see Plaintiff's Mem. at 12; Plaintiff's Reply at 3, there is substantial evidence which supports the ALJ's determination. Plaintiff's therapist recorded in March of 2004 that Plaintiff had appeared regularly for at least three counseling sessions, (R. at 239-40), and that he was "coping + functioning satisfactorily," (R. at 240). Plaintiff read newspapers for thirty minutes a day and read the Bible for thirty minutes a day. (R. at 17, 114) He did not require assistance with dressing or bathing. (R. at 17, 45) He played dominos and cards with his mother for six to eight hours a day. (R. at 17, 114) While Plaintiff testified that he virtually never went out, (R. at 51), and did not do any household chores (such as cooking, washing dishes, laundry, vacuuming, and mopping), (R. at 50), there was no suggestion that this was due to a lack of ability. Plaintiff testified that he could cook, (id.), but that his mother did most

---

difficulties due to substance [abuse]." (R. at 350)

of the cooking, (id.).

Finally, the ALJ was not required to accept Plaintiff's testimony. Indeed, he found Plaintiff not entirely credible, (R. at 18), and the record provided ample basis for doubting Plaintiff's credibility, particularly with regard to his drug and alcohol use.[13]

**Summary**

The ALJ's finding that Plaintiff did not meet Listing 12.05B is supported by substantial evidence. The expert opinions of Drs. Capps, Schwartz, and Menken provided a valid basis for discounting the results of the IQ tests administered by Dr. Curran. Accordingly, the ALJ was not required to accept those results when they were inconsistent with other evidence in the record.

**Conclusion**

For the reasons stated above, I find that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence in the record and free of legal error. Accordingly, I order that Defendant's Motion to Affirm be granted and that Plaintiff's Motion to Reverse be denied.

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
April 30, 2008

[13] The ALJ discussed at length Plaintiff's non-compliance with medical instructions and the degree to which substance abuse played a role in that non-compliance. (R. at 18); see also (R. at 161, 177, 186, 284, 292, 350-351); cf. Clark v. Apfel, 141 F.3d 1253 (8th Cir. 1998) (quoting Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)(noting that inconsistency in IQ test scores should be examined "to assure consistency with daily activities and behavior")).